JACOB SELIGMAN ET AL. v. ESTATE OF EGBERT TEN EYCK.

[See 48 Mich. 230; 49 Mich. 104; 53 Mich. 285.]

*Contract for sale of timber and logs—Assertion by vendee of claim thereunder—Proof of statements of vendee tending to dispute the existence of such claim, competent—While not legally conclusive, is entitled to consideration—Delivery of logs—Testimony of witness thereto,[1] incompetent if not shown to have personal knowledge of such delivery—Offer of counsel to show such knowledge should be kept while witness is on the stand—Estate of deceased person—Claimant cannot testify why he wrote letters to deceased affecting claim—Reasons only competent if known to deceased—If known, claimant not a competent witness—Log scale—How may be shown[2]—Remarks of counsel in summing up case, outside of any proper issue for the jury, unauthorized.[3]*

1. On a trial involving the existence of any valid claim against a vendor under a contract for the sale of timber and saw logs, it is competent for a witness to testify to statements made by the vendee, referring, as claimed, to such contract, and which, if so referring, tend to dispute the existence of any such liability; it being further claimed that a mortgage given by the vendor on said property was taken on the faith of such statements and representations. The testimony, while not legally conclusive, is entitled to consideration.

2. A witness testified on his direct examination to the delivery of certain saw logs, but on cross-examination it appeared that he had no personal knowledge of such fact. A motion was made to strike out his direct testimony, which was denied on the statement of the opposing counsel that he intended to show such knowledge, which was not done, and the testimony allowed to stand.

   *Held*, that the proper time to make such proof was while the witness was on the stand, and in its absence the testimony objected to was incompetent.   (See Note 1.)

---

NOTE 1.—On direct examination Kroll testified that he knew the logs marked "T. E. N."

"Q. When were those logs delivered in the Tittabawassee Boom Company limits?

A. During the driving season of 1879—about the first of July I think.

CROSS-EXAMINATION.

Q. Did you run the logs yourself?

A. I did not.   Smith and Adams drove them with others.   I let the contract to drive them with others.

Q. Where were you while the logs were being run?

A. In Saginaw most of the time.

3. A claimant against the estate of a deceased person was permitted to testify *why* he wrote certain letters to the deceased.

*Held,* that the facts testified to could only be competent if brought to the knowledge of the deceased, and as to such facts the claimant was not a competent witness.

4. From the nature of the lumbering business, it is sometimes impossible to prove a scale of logs with greater certainty than was done in this case. (See Note 2.)

---

Q. How far did the logs have to be run to be delivered?
A. About 50 miles."

A motion was here made to strike out the testimony given on the direct examination as to the delivery of the logs, because the witness did not testify from personal knowledge; whereupon the opposing counsel stated that he intended to show that Kroll "knew all about it," and the motion was denied "at this time" by the court. Such knowledge was not shown, and error was assigned on the refusal to grant the motion.

NOTE 2.—The evidence objected to was given by Charles Holland, who testified to scaling logs for Ten Eyck in 1878-9 for a month or over. That one Comins scaled with him part of the time, to whom he gave his figures, and by whom the scale bills were made out.

A paper was shown the witness, and he testified to its correctness; that the figures thereon were his, but not the writing; that Comins had the scale books, and that the scale bill receipted by witness was not prepared by him.

Q. "What information had you at the time as to the correctness of this receipted scale bill?
A. We scaled the logs together; the books were with him, and after we agreed on the scale I signed the bills, I think.

Q. How did you scale these logs—state the manner of scaling—did you both scale the same log?
A. We were both at the skids at the same time, on a portion of them. The latter part I scaled all myself.

Q. When Comins was scaling you scaled with him?
A. Yes, I was at one end of the skid-way, and he at the other.

Q. You scaled one end and he the other?
A. Yes, sir.

Q. The same logs?
A. One of us would stand at one end of a log, and the other at the other end would copy the description of the logs. There was a tally boy present.

Q. As the amount of each log was announced would you read it?
A. The amount was given to the tally boy. I had the small end of the log and gave the figures to Comins, and he repeated them to the tally boy. I heard them as given. The figures carried by the tally boy were added up by both Comins and myself in the evening. We verified the computations made and found them correct. Each day's work was put on a book by itself.

Q. Try and give us an idea of the method or manner in which you arrived at the entire quantity of the "T. E. N." logs scaled by you during the winter; you say you made a statement of the quantity named in that statement, and kept a proper account of the logs scaled by each of you?
A. We footed up these together he footed them up and I did the same thing; when we got through we put each day's work together, and arrived at the result.

**5.** In summing up a case counsel is not authorized to go outside of any proper issue for the jury, in his remarks.    (See Note 3.)

Error to Saginaw.    (Gage, J.)    Argued January 19–20, 1886.    Decided April 8, 1886.

Appeal from judgment in favor of claimant against estate.

---

*The Court:*
Q. Did you foot them yourself together, personally?
A. Up to a certain time, not the last.
Q. Where you put them together first, give us those figures?
A. I couldn't do it.
Q. Who was the party that put the figures together last?
A. Mr. Comins alone.
*Mr. Draper:*
Q. Were the figures that you presented to Comins from time to time correct measurements of the logs as you measured them?
A. They were.
*Mr. Hanchett:*
I object on the ground that I don't understand that he gave Comins the measure.    The result was announced and preserved by the tally boy, who also kept what was measured by Comins, and preserved the figures finally put on paper.
*Mr. Draper:*
I asked him if the footings that he made, and the figures that he gave Comins from time to time, and from which, in the end, perhaps Mr. Comins made his figures, were correctly given and correctly footed up.
Objected to as incompetent until it is shown by the person who put the figures down, and which were afterwards footed by Holland, that he kept the account correctly; overruled and witness answered, "they were."
Q. You afterwards footed up those figures put down by the tally boy that you gave?
A. Yes, sir, that he gave.
Q. Did you also foot up those Comins gave the tally boy, or simply your own?
A. They were all footed together.    We footed them together.
Q. In your judgment, from the logs that you scaled, what do you say as to whether or not the figures were correctly put down by the tally boy, or substantially so?
Objected to as incompetent.    Overruled.
A. To the best of my knowledge and judgment, they were correct."

NOTE 3.—After the evidence was closed, plaintiff's attorney, in his argument to the jury, remarked "that counsel for the defense had said that the defense labored under some embarrassment in getting at the amount still claimed to be due the plaintiff, it not being conceded; but the real embarrassment arose from the refusal of the defendant's counsel to put the books of Ten Eyck in evidence."  To these remarks defendant's counsel excepted and the court said:
"I don't think counsel ought to make a remark that would lead the jury to think there is something on the books which, if explained to them, would cause them to think that something had been kept back purposely, if the remarks counsel made are broad enough to lead to that inference."

Reversed. The facts are stated in the opinion and foot notes, and in former reports of same case found in 49 Mich. 104, and 53 Mich. 287.

*Wheeler & McKnight* and *Benton Hanchett*, for estate :

Deceased's books of account were received in evidence on the former trial of this case, and the entries made use of by the claimants to aid in establishing their claim ; but it was held by this Court that such entries could not be used without explanations which no one but the deceased could give, and therefore were incompetent evidence ; *Seligman et al v. Estate of Ten Eyck*, 53 Mich. 285, 290–1. Counsel for plaintiffs had no right to make any use whatever of these books, or of the fact that they were not put in evidence. If competent evidence, the claimants could offer them : *Corning v. Woodin*, 46 Mich. 44 ; *Brown v. Swineford*, 44 Wis. 282.

*W. S. Tennant and Wisner & Draper*, for plaintiffs :

Where evidence has a legal tendency to make out a proper case in all its parts, its weight and sufficiency, however slight, are questions for the jury alone : *Conely v. McDonald*, 40 Mich. 151 ; *Rosie v. Willard*, 44 Mich. 382 ; *Schuchardt v. Allen*, 1 Wall. 369 ; *Drakely v. Gregg*, 8 Wall. 268 ; *Insurance Co. v. Rodel*, 95 U. S. 238.

If upon any point essential to a recovery the evidence bearing upon it is open to but one meaning, and that meaning is plainly and necessarily adverse to the party, there can be no

---

*Mr. Draper:*

"The books were brought here for the purpose of showing that payments had been made, and Mr. Wheeler's attention was directed to them, and he was asked if the account was in court, and if they didn't admit that these payments had been made and this balance struck; and McCormick was asked if Kroll didn't look over that account, and from it the $3,800 was made up. I say the embarrassment was occasioned by their refusal to put in the record itself. I offered that they might put the books in evidence, and said it was the amount of logs stated by Kroll under the contract."

*Mr. Hanchett:*

"We except to that remark. The books were in court and equally open to them and to us."

*Mr. Draper:*

"It was stated that nobody but Ten Eyck could testify as to the account, etc. We conceded that the books showed it."

Exception was taken to these remarks, and error assigned thereon.

[See 53 Mich. 290–1, for full statement of entries on Ten Eyck's books.]

ground of complaint if the case be taken from the jury: *Kelly v. Hendrie*, 26 Mich. 256.

Whether evidence bearing upon a certain point tends to establish it or not, depends alone upon that particular view of the evidence, and in these cases the duty to examine, weigh, and compare evidence is not entrusted to the judge: *Gaines v. Betts*, 2 Doug. 98; *Berry v. Lowe*, 10 Mich. 15; *Hyde v. Nelson*, 11 Mich. 357; *Perrott v. Shearer*, 17 Mich. 54; *Blackwood v. Brown*, 32 Mich. 107; *Elliott v. Van Buren*, 33 Mich. 52; *Maas v. White*, 37 Mich. 130.

The only safe rule is for the jury to pass upon the facts. The credibility of witnesses, the strength of the testimony, its tendency and proper weight, are matters peculiarly within their province.   *Conely v. McDonald*, 40 Mich. 159.

CAMPBELL, C. J. This case comes up a third time on error from the Saginaw circuit, upon a claim disallowed by the commissioners on the estate, but allowed at the circuit by verdict. The claim presented was for what remained due under a contract made November 23, 1878, between John P. Kroll and the decedent, whereby Kroll was to deliver 2,000,000 of white pine logs not less than 14 inches in smallest diameter, from section 12, the N. ½ of section 13, and the N. E. ¼ of section 14, in town 20 N., of range 1 E. The price was to be five dollars a thousand feet; payable, three dollars when the logs were delivered within the Tittabawassee boom limits, and two dollars, November 1, 1879. These logs were to be marked "T. E. N.," and scaled by an agreed scaler. Ten Eyck died in August, 1879. The logs were cut in the winter of 1878–79, and scaled that winter. There was claimed to remain due a balance of $3,815.27, Ten Eyck having advanced during his life-time beyond what was due at the time.

The defense was chiefly based on offsets arising from the sale by Kroll of logs belonging in whole or in part to Ten Eyck, to an extent exceeding any balance on these "T. E. N." logs; and the principal grounds of error relate to rulings by the circuit court upon the effect of certain contracts and transfers, and the admission of testimony to do away with their force. There are several minor questions also.

Kroll was lumbering on several sections in the same neighborhood. Sections 11 and 12, and sections 13 and 14, in town 20 N., range 1 E., are the lands on which logs were cut. Ten Eyck, representing a special partnership of C. & E. Ten Eyck, of which he was the general partner, had considerable dealings in lumber with Kroll, had made advances for him, and had purchased logs of him.

In October, 1877, Kroll made a bargain with George H. Ensley, whereby Ensley was to cut all the white and Norway pine on the N. E. ¼ of section 14, and the N. W. ¼ and S. ½ of the N. E. ¼ of section 13, and bank and float it ready for the first water in the spring of 1878. Kroll could also, at any time before January 1, 1878, require Ensley to cut the timber on the N. ½ of the N. E. ¼ of section 13. For this, Ensley was to have $2.10 a thousand, payable in fixed sums as the logs were skidded, banked, and set afloat. The expenses of scaling were to be divided. C. & E. Ten Eyck guaranteed to Ensley, Kroll's fulfillment of his obligations. In the same month of October, 1877, Kroll agreed with C. & E. Ten Eyck to sell them all of the common white pine logs to be cut under the Ensley contract, and deliver them in the boom limits as early in spring as possible, for five dollars a thousand, taken under the scale provided for by Ensley & Kroll. All sums paid or assumed to Ensley, or to Ortmann & Rothschild, were to apply on the five dollars, and if made before September 1, 1878, were to bear interest. This contract did not cover Norway or any but common white pine. In February, 1878, or perhaps in January, Ensley quit, having cut and skidded 3,769,665 feet, of which 2,200,-000 were banked. On this he had been slightly over-paid, receiving in all $6,006.

On the twenty-third day of February, 1878, Kroll sold and conveyed to C. & E. Ten Eyck all his right, title, and interest in a lot of white pine saw-logs then being put into the Tittabawassee river under the Ensley contract, marked "J. P. K." These "J. P. K." logs were small logs.

In the spring or summer of 1878 Kroll executed a contract, which has been prominent in both of the former rec-

ords as well as in this, inasmuch as he claims it was inopera-
tive. It is an absolute conveyance of one-half of all the pine
timber standing or being on section 12, and on five 40-acre
tracts on section 11, and all the logs and timber cut on those
lands that season, for $1,500 ; and it was provided that, inas-
much as Kroll was somewhat indebted on the purchase, the
balance due from him might be paid from the proceeds of
sale of the timber.

In this same contract Kroll agreed to cut, haul, mark, and
deliver in the boom of the Tittabawassee Boom Company,
all the logs thereby sold, and all cut, or to be cut, on the N.
½ of section 13, and the N. E. ¼ of section 14, and to be paid
$2.75 a thousand, except about 2,000,000 feet put in by Ens-
ley, for which he was to be paid $2.60. All rent and charges
for banking-ground were to be divided, and paid by each
party, and the same as to boomage charges, unless paid by
purchasers. For settlement purposes the scale on sale to
third parties, or if not sold the scale under rope by some
competent disinterested party, was to govern.

At this time C. & E. Ten Eyck appear, from these papers,
to have owned absolutely the lot of Ensley "J. P. K." logs cut
by Ensley up to February, 1878, from sections 13 and 14.
They had a contract to purchase the rest of the white pine
common logs cut by Ensley, at five dollars, on 13 and 14 ;
and by this undated contract they owned an undivided half of
the logs on and from 11 and 12, subject to $2.75 a thousand ;
and were to pay on their former purchase of Ensley logs $2.60
a thousand for services, including delivery in the boom.

Things stood in this way, so far as the contracts show, in
November, 1878, when the contract now sued upon was
made. By this contract an agreement was made to furnish,
at five dollars a thousand, 2,000,000 feet of white pine com-
mon logs, of a size to exceed 14 inches at the smaller end,
which were to be cut from sections 12, 13, and 14. Of those
claimed to have been cut, there were about half a million
from section 12.

So far as these logs were to come from 13 and 14, it is
entirely consistent with all the previous contracts. And, inas-

60 MICH.—18

much as Kroll owned an undivided half of the timber on section 12, there was, so far as we can see, nothing repugnant as to that. Beyond that undivided interest, he was entitled to pay, for cutting and delivering at the boom, a sum which considerably exceeded the value of the logs themselves on the ground, as fixed by any of these arrangements. There is no legal reason why these contracts may not all stand together.

A point was urged, both on the trial below and in this Court, to the effect that Ten Eyck did not take any action under the undated contract; and that although it was found in his possession, and, as we held previously, must be presumed to have been delivered and accepted, yet it could not become practically operative without some further action by him.

This contract was an absolute sale of the undivided half of the timber cut and uncut on sections 11 and 12, whether large or small, white or Norway, for $1,500. All of this was to be banked and boomed at agreed rates. But the contract expressly contemplated that sales would be made in the boom, and that the unpaid purchase money due from Kroll might be paid out of the proceeds. There is nothing contemplating that Ten Eyck was to make sales any more than Kroll, if at all; and there can be no doubt that if Kroll made sales, he must account for them. There could be no call for action by Ten Eyck until in arrears to Kroll for services, and he could not be in arrears if Kroll had funds belonging to him.

The principal controversy arose out of various matters which, it was claimed, were inconsistent with the rights which Ten Eyck would have had if full force should be given to the transfers of title under which he apparently held rights. These do not all appear to have been treated alike below, and should be, to some extent, kept separate.

It must be considered, in the outset, that every presumption must stand in favor of the full efficacy of these documents, until overthrown; and it must also be assumed that they can only be impeached by the conduct of Ten Eyck him-

self, and that Kroll is not a competent witness as to matters between himself and Ten Eyck upon which Ten Eyck if living could have testified himself.

The circuit court allowed the jury to consider whether the contract of February, 1878, whereby certain logs were transferred to Ten Eyck, was not given by way of security collateral to the guaranty to Ensley. We have found no testimony in the record which in any way tends to support such a theory. So far as anything appears on the subject, Ensley was already paid; but, whether he was or not, the case does not show anything, which we have been able to discover, which would authorize this transfer to be treated as anything else than a transfer in fact.

Neither have we discovered anything to authorize the court below to lay any stress on the alleged failure of Ten Eyck to advance money under the undated contract. As already suggested, it called for no advances, and required no payment under any circumstances until logs should be delivered, and charges not otherwise provided for. Neither did it require any action on Ten Eyck's part in the management of the business, and the charges on both these points were, we think, erroneous.

Testimony was given by one Bartow of statements of Ten Eyck which, it was claimed, referred to the timber covered by the undated contract, and which, if so referring, had some tendency to dispute the existence of any claim under that contract; and, in connection with these statements, there was proof of a mortgage given by Kroll to Mr. Hoyt, taken, as claimed, on the faith of these representations.

We think this testimony was admissible for the purpose mentioned. While not legally conclusive, it was entitled to consideration. Some portions of it were, perhaps, open to objection as not sufficiently distinguishing between Ten Eyck's and Kroll's conversation, and it was not competent to show for what purpose Bartow went to see Ten Eyck, unless so far as it was explained to Ten Eyck; but the subject itself was pertinent, and so was a considerable part of the testimony.

Similar considerations apply to the correspondence and dealings concerning the mortgage to Mr. Lockwood. That testimony was admissible as having some weight circumstantially in the same direction.

Some testimony was received from Mr. Kroll concerning the delivery of logs, of which he had no personal knowledge. The court seems to have received it on a statement that such knowledge would be shown; but, as he was then on the stand, that was the proper time to show it. It was also incompetent to allow Kroll to testify why he wrote certain letters to Ten Eyck. This could only be competent if brought home to Ten Eyck's knowledge, and upon matters so known Kroll was not competent.

The same considerations apply to Kroll's testimony about not seeing the contract after he signed it, except in Mr. Wheeler's hands, and what took place at that time. The direct bearing of so much of this as is pertinent at all was to impeach a paper by contradicting presumptions, on a matter in Ten Eyck's knowledge as well as Kroll's; and, in reference to this contract, we think the defendant was right in claiming that, if title once passed under this contract to Ten Eyck, it could not get out of him without some act of release or re-transfer. The real controversy here must have been whether or not the possession of the paper by Ten Eyck was by virtue of an effective delivery, or in some other way.

We think the evidence of scaling was not incompetent. From the nature of the business it cannot always be possible to show more than was shown here: *Smith v. Kelly*, 43 Mich. 390.

The remarks of counsel concerning the books, made in the summing up, were outside of any proper issue for the jury, and not authorized to be allowed to influence them. The court below took this view correctly.

We have referred to all the material points which were discussed on the argument, and think there was error in the particulars which we have specified. The judgment must be reversed, with costs, and a new trial granted.

The other Justices concurred.