# ITASCA CEDAR & TIE COMPANY v. GEORGE A. McKINLEY and Another.[1]

January 2, 1914.

Nos. 18,181—(32).

**Assignment of contract—material in process of manufacture.**

1. Plaintiff in replevin claimed title under certain contracts of sale. Under the first contract one of defendants agreed to manufacture and deliver to plaintiff certain timber products. It is conceded that no title passed under this contract. Defendant proceeded to fulfil the contract, manufacturing part of the material himself and procuring part to be manufactured by others. Later a second contract was made, by the terms of which defendant assigned to plaintiff "all interest in all contracts he has of every nature and description for the manufacture and sale of material of the kinds mentioned in said (first) contract." *Held,* that this did not operate to assign to plaintiff the contract between plaintiff and defendant, and did not pass title to material in process of manufacture by defendant himself.

**Evidence of value—testimony of expert.**

2. Defendant McKinley was the owner of cedar telegraph poles taken in replevin. Some he had purchased and some he had manufactured himself, participating in the work of getting the material out of the woods, taking it from the river and sorting and manufacturing it in the yard. With plaintiff's president he spent three weeks making an estimate of the material in piles. Still later, as the material was loaded out of the yard, he was on the ground nearly all the time. He was an experienced timber man and familiar with values. McKinley's evidence was competent.

**Evidence of value.**

3. Plaintiff's president testified that the estimate made by himself and McKinley amounted to $35,000 or $40,000, and that it covered all but about 6,000 pieces. Defendants offered to prove that it covered not more

[1] Reported in 144 N. W. 768.

Note.—On the question what is provable by books of account, generally, see note in 52 L.R.A. 689. And as to party's books of account as evidence in his own favor, see note in 52 L.R.A. 546. And for books of account as evidence between other parties, see note in 53 L.R.A. 513.

than half of the yard. The evidence was proper and should have been received.

### Evidence of cost of manufacture.

4. Plaintiff offered proof that the actual cost of completing the manufacture and delivery of the material taken in replevin was $12,000, and that this was the reasonable value thereof. Defendants offered to prove by defendant McKinley that the reasonable cost of such manufacture and delivery did not exceed $5,000. McKinley was familiar with the cost of manufacture. The evidence should have been received.

### Evidence of admission.

5. Defendants offered proof that plaintiff's president stated, in the course of negotiation on this subject, that it would cost from $4,000 to $5,000 to complete the manufacture and delivery of this material. The evidence was proper as proof of an admission, and should have been received.

### Books of account.

6. Plaintiff's books of account, showing the amount and character of material sold and the cash transactions incident thereto, made in the usual course of business, and properly verified, were admissible in evidence, although part of the entries were made from reports of persons not employed by plaintiff, since these reports were produced and verified on the stand by the persons making them. The fact that some of the entries were made after suit was brought did not render them inadmissible.

### Memorandum inadmissible.

7. A memorandum of an inventory taken by two persons was made by one, on information called off to him by the other. The person making the memorandum was not produced as a witness, the other made no attempt to verify the memorandum. It was properly rejected.

### Same.

8. Memoranda made by two other persons of an inventory made in similar manner, but checked back and verified in a measure by both, *held* admissible under facts stated in the opinion, though only one of the persons participating in the inventory was produced as a witness.

Action in replevin in the district court for St. Louis county to recover possession of certain timber and its products or, in case possession could not be obtained, for $50,000 the value thereof and $10,000 for its detention. The case was tried before Stanton, J., who denied motions for directed verdicts, and a jury which returned a

verdict, that plaintiff was entitled to the possession of the property. From an order denying their motion for a new trial, defendants appealed. Reversed and new trial granted.

*H. L. & J. W. Schmitt,* for appellants.

*Fryberger & Fulton,* for respondent.

HALLAM, J.

This is an action in replevin to recover possession of a quantity of timber products located in the yards of defendant McKinley, at Brainerd, Minnesota. The action was commenced and the property seized under writ of replevin in September, 1908. Plaintiff recovered a verdict. Defendants appeal from an order denying their motion for a new trial.

Replevin is a possessory action, and it was incumbent upon plaintiff to prove its right to immediate possession. Plaintiff's claim is that it had purchased the property in question from defendant McKinley. It claims that, by virtue of the contracts between them, title passed to plaintiff, and, with it, right of possession. There is no claim that plaintiff was entitled to possession if title did not pass by these contracts. This is the first question to be determined.

1. We are of the opinion that under these contracts the title did not pass to plaintiff.

The facts, so far as here important, are as follows:

On October 1, 1906, plaintiff and defendant McKinley entered into a contract, designated Exhibit B, by the terms of which, among other things, defendant McKinley agreed to sell and deliver to plaintiff a quantity of cedar telegraph and telephone poles and also railroad cross ties, at prices fixed therein. Plaintiff agreed to make certain advances as the work progressed. It is conceded that this contract was executory and did not pass title to any of the material contracted for.

McKinley proceeded to carry out this contract. Some of the material he manufactured himself, and some he procured by contracting with others. It soon developed that with his limited capital he could not fulfil his contract without larger advances than the contract called

for. In order that plaintiff might safely make larger advances, another contract was made January 26, 1907, designated Exhibit J.

This provided that:

"The first party (McKinley) in consideration of the premises herein, hereby sells and transfers the title to the second party (plaintiff) of all material that has been manufactured under said contract to date * * * ." This paragraph is unequivocal, but it is not very important here because the material "manufactured under said contract to date" of Exhibit J composed a very small part, if any at all, of the material taken under the writ of replevin. Exhibit J contains the further provision: "The party of the first part further assigns and sells to the party of the second part all interest in all contracts he has of every nature and description for the manufacture and sale of material of the kinds mentioned in said contract. The second party, however, does not assume any obligations with reference to the terms of said contracts except such as it shall deem advisable. Provided delivery of material under any of said contracts with third parties shall be accepted as delivery under the original contract."

This paragraph is the important one. It clearly assigns all contracts McKinley had with third parties for the manufacture of material of the kinds mentioned in Exhibit B, and it operated to transfer to plaintiff the title to all such material as soon as McKinley acquired title to it under such contracts. But this by no means covered plaintiff's case. It would appear that a large part of the material taken under the writ of replevin was gotten out and manufactured or was in process of manufacture by McKinley himself, and, unless the title to this also passed to plaintiff, the present verdict cannot stand.

Plaintiff's contention is that Exhibit J did operate to transfer to plaintiff the title to this material. Plaintiff's argument is that the assignment by McKinley to plaintiff of "all interest in all contracts he has of every nature and description for the manufacture and sale of material of the kinds mentioned in said contract," operated as a transfer by McKinley to plaintiff of Exhibit B, the contract subsisting between themselves, and incidentally as a transfer of title to

all material in process of manufacture under it. We cannot sustain this contention. We know of no principle of law by which one party to a contract can assign his part of the contract to the other party, and still have the contract remain in force. We are cited to no decision of any court that so holds, and we know of none. An assignment of a contract such as this carries with it a right to perform and a right to receive the stipulated price. Plaintiff's contention involves the absurd situation of a party to a contract acquiring the right to perform an obligation due to himself, and to receive from himself the price or compensation which he himself is to pay. It appears to us that the complaint was not drawn on any such theory. But, however this may be, we are quite clear that the contract cannot be so construed.

Plaintiff's right of recovery is predicated solely on the theory that Exhibit J passed title to the material taken in replevin. Since this theory is, in our opinion, untenable, as to at least a large part of the material, the verdict cannot stand.

In view of a new trial, some of the court's rulings upon evidence should be considered.

2. Defendants offered to prove by defendant McKinley the value of the property when it was taken. This evidence was ruled out on the ground that he had not shown himself competent to testify on this subject. This was error. McKinley was the owner of this material. Some of it he had purchased, and some he had manufactured himself. Over objections most persistent and technical, it was made to appear that he had actually participated in getting out the portion manufactured by himself, that he had taken part in getting it out of the woods, in taking it from the river at Brainerd, and in sorting and manufacturing it in the yard, and that he had seen practically every pole of it before it was piled. It appeared from the testimony of Mr. Johnson, plaintiff's president, that at the inception of trouble between them, McKinley and Johnson went together to Brainerd to make as close an estimate of this material as they could, "to see who was right about the money question." Both parties were apparently satisfied that they could make an estimate that would be a guide to themselves. They spent about three weeks at this. The poles were

then in large piles. McKinley testified that they counted the poles and valued the material as they went along. Plaintiff's counsel examined Johnson at length as to this estimate and the amount estimated. Still later this material was loaded out from the Brainerd yard by plaintiff, and while this work was going on McKinley was "on the ground pretty near all the time." He was an experienced timber man and was familiar with values. Clearly he was a competent witness as to the value of this material, and his evidence should have been received. His evidence was probably not a close test of value, in view of the fact that some of the defects to which cedar poles are subject can only be discovered by close inspection, but this fact did not render his evidence wholly valueless. The evidence was competent, and sufficient foundation was laid to require that it be received.

3. The evidence of both McKinley and Johnson showed that they did not complete their estimate of the material in the yard. They disagreed as to what proportion of the material was estimated. Johnson testified that the material estimated amounted to $35,000 or $40,000, and that their estimate covered all but about 6,000 pieces. Thereupon defendant offered to prove that the material estimated was no more than half of that in the yard. The offer was rejected. It seems clear that this testimony should have been received.

4. After this property was taken in replevin, its manufacture was completed by plaintiff, and it was then sold by plaintiff to the National Pole Co. Plaintiff gave defendants credit for the amount sold, at contract price, less the cost of manufacture and delivery, which plaintiff claims was about $12,000. Plaintiff produced evidence that this amount was the reasonable cost thereof. Defendants then offered to prove by defendant McKinley that the reasonable cost of completing the manufacture and delivery of this material did not exceed $5,000. This was ruled out, on the ground that he was not shown to be competent to testify. McKinley showed himself to be familiar with the cost of manufacture. In view of this fact and of the facts above recited, the evidence should have been received.

5. Defendants offered to prove by McKinley that Johnson, acting as president of plaintiff, stated at a conference at Mankato, before the commencement of the action, that it would cost from $4,000 to $5,000 to manufacture and load out the balance of the material according to the terms of the contract. This evidence was rejected. It should have been received. It was an admission of the president of plaintiff corporation while in charge of the business of the corporation to which the admission pertained, and in the course of negotiation of such business. Defendant Hoerr later gave evidence of this same admission. McKinley's evidence was accordingly cumulative, but it should have been received.

6. Plaintiff's books of account were admitted in evidence. They were made up from reports made by inspectors, some of whom were in the employ of plaintiff and some in the employ of the National Pole Co. The reports were produced and were verified on the stand by the persons making them. These reports were transcribed into plaintiff's regular books of account. These books contained also the record of sales of this material and of the cash transactions incident thereto, which are usual in books of account of mercantile transactions. These entries were made in the usual course of business and in the usual manner of books of account, and were amply verified. Plaintiff had kept its books in this manner before this suit was brought, and continued to keep its record of these transactions in the same way, without change after suit brought. The entries, both before and after suit brought, were received in evidence. As far as concerned items based on reports from the National Pole Co.'s inspectors, the books may not have been books of account within the statute (G. S. 1913, § 8437) but they were admissible in evidence under the common-law rules prevailing in this country, and were properly received. Butler v. Cornwall Iron Co. 22 Conn. 335; Chicago & Alton R. Co. v. The American Strawboard Co. 190 Ill. 268, 60 N. E. 518; Chicago Lumbering Co. v. Hewitt, 64 Fed. 314, 12 C. C. A. 129; Mississippi River Logging Co. v. Robson, 69 Fed. 773, 16 C. C. A. 400; Fortier v. Skibo Timber Co. 111 Minn. 518, 127 N. W. 414. Where entries of this sort are verified by all persons who took any part in making them, they should be received in evidence. The books were properly received.

This case is distinguishable from Fidelity & Casualty Co. of New York v. Crays, 76 Minn. 450, 79 N. W. 531; Union Central Life Ins. Co. v. Prigge, 90 Minn. 370, 96 N. W. 917, where the entries were made from data received from third persons, without verification.

The fact that some of the entries were made after suit was commenced does not render them inadmissible. See Fortier v. Skibo Timber Co. 111 Minn. 518, 127 N. W. 414.

7. Invoices made by defendants after suit brought were offered in evidence by defendants and rejected. One of these was known as Exhibit 32. It was in no sense a book of account. It was simply a memorandum of a count made by two men, Erlandson and Hanoway. Erlandson alone testified. He said that he "counted the stuff and called it off" and that Hanoway "was supposed to mark it up." The witness paid no attention to the memorandum made, because others were supposed to check it up. Certainly this record was properly rejected.

8. Defendants' counsel asked McKinley to testify from an invoice, designated Exhibit 34, the number of pieces in certain piles. Objection was made, and the court sustained the objection, apparently on the ground that the memorandum was not properly authenticated. This was error. Exhibit 34 was a book purporting to be a record of a count made by McKinley and one Marvick. Marvick was not produced as a witness. McKinley described their method of work as follows: Part of the time Marvick counted and called off the figures to McKinley, who put them down. "Mr. Marvick would count ten poles" he said, "then he would give them to me, then he would count ten more and give them to me, and when he would get a hundred he would mark it on the pile and he would go on and count * * *. These piles we took were large piles, with all the way from a thousand to fifteen and sixteen hundred poles in a pile * * *. When we got through with that pile we would count the hundreds in that pile, then checked it up with the count we had on the book to see whether we were correct or not * * *. We didn't count the poles again." Part of the time McKinley counted. He called off the result to Marvick, who put it down in McKinley's presence. McKinley further testified as to this: "I checked them afterwards * * * when I got a hundred poles counted, I

marked it down and he had to have marks in that book in order to correspond with my count when he got through."

As was said in Seligman v. Estate of Ten Eyck, 60 Mich. 267, 276, 27 N. W. 514, 517: "From the nature of the business it cannot always be possible to show more than was shown here." See also Sullivan v. Godkin, 167 Mich. 663, 133 N. W. 481.

It seems highly desirable that on a new trial the issues be so framed that a full accounting and determination may be had of all matters in controversy between these parties, in order that this single lawsuit, when it is concluded, shall put an end to their litigation.

Order reversed and new trial granted.

On appeal from the clerk's taxation of costs the following opinion was filed on February 3, 1914:

PER CURIAM.

The item $170 for copying exhibits is disallowed. The order settling the case shows that a transcript of these exhibits was incorporated in the settled case. The motion for a new trial was made on this settled case. The expense thereof was a disbursement in the trial court. If further transcripts were made later the expense thereof cannot be taxed.

The item "printer's fees printing paper books, 904 pages at 75c. $678" is reduced $122.50, 150 pages of the portions objected to being unnecessary to present any assignment of error made.